# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

JUDITH HIZER,          )
                                 )
        Plaintiff,       )
                                 )
        v.                )      CAUSE NO.: 3:11-CV-500-TLS
                                 )
SOUTH BEND TRIBUNE,   )
                                 )
        Defendant.     )

## OPINION AND ORDER

Plaintiff Judith Hizer is suing her former employer, the South Bend Tribune, for failing to accommodate her disability in violation of the Americans with Disabilities Act (ADA). She also alleges that the Defendant terminated her employment because of her disability and in retaliation for asserting her rights under the ADA and other federal statutes. The Defendant has moved for summary judgment. In response to the Defendant's Motion, the Plaintiff, for the first time, asserts that she was subjected to a hostile work environment in violation of the ADA. For the reasons stated in this Opinion and Order, the Court finds that there are no triable issues of fact for any of the claims, and the Defendant is entitled to judgment in its favor as a matter of law.


## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in her favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A district court should deny a motion for summary judgment only when the non-moving party

presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); *Swearnigen–El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598–99 (7th Cir. 2000). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

## STATEMENT OF FACTS

The Plaintiff began working for the Defendant newspaper in July 2005 as a part-time editorial coordinator. The Plaintiff worked in the Flagship Publications Department, which consisted of a group of niche publications that the Defendant created, managed, produced, and published. These publications included magazines like *Inside Granger* and *InMichiana*.

In July 2009, the Plaintiff reported to her supervisor, Mike Pozzi, that she was inadvertently sprayed by an automatic air freshener in a workplace restroom and was having an allergic reaction. Pozzi permitted the Plaintiff to go home where she showered and worked at

home for the remainder of the work day. Following this incident, the Plaintiff asked the other employees who worked in her department to wear products with less scent and to avoid spraying it while they were at work. The Plaintiff also asked the employees to clean their desks with a natural cleaning product she had provided. The Plaintiff's co-workers complied with these requests. The Plaintiff's desk was also moved near a window that she could open. The Plaintiff began working with the Human Resources Director, Raquel Harris, and the Facilities Manager, Bill Morey, to obtain a restroom facility free from perfumes or other scented sprays, as this continued to be an area where she experienced problems.

On September 24, 2009, the Plaintiff telephoned her physician, Dr. Janice Smith, to report that she was not able to tolerate hair spray, perfumes, and other sprays in public restrooms because it caused her asthma to flare up. The Plaintiff requested that Dr. Smith write a letter so that she could get her employer to designate a private restroom for her where she would not be exposed to these sprays. Dr. Smith wrote the letter for the Plaintiff, which stated: "Judith Hizer is intolerant of perfumes, hair sprays, and items with fragrances. To prevent her Asthma from flaring up, she should have her own restroom so she isn't exposed to so many accelerants." (Ex. C, ECF No. 23-4 at 15.)

In response to this letter, the Defendant designated the second floor library ladies' restroom as a chemical free restroom and notified its employees not to use the restroom if they were wearing perfumes. On September 29, 2009, the Plaintiff sent an e-mail to Morey and Harris requesting that the aerosol air freshener in the chemical free restroom be removed. On September 30, 2009, Morey responded to Hizer with an apology and stated that the aerosol air freshener had been removed from the chemical free restroom. The Defendant implemented the

cleaning agents the Plaintiff requested.

On November 23, 2009, the Plaintiff emailed Harris and Morey and reported that someone had sprayed a chemical air freshener in the restroom that was designated as chemical free. She further reported that it was not yet a huge issue because she was using the restroom behind Human Resources when needed. However, she advised that this would become problematic if she had a fibromyalgia flare-up because stairs would then become an issue. She asked that a notice be placed on the door of the restroom door reminding others that it was designated as chemical free.

On December 14, 2009, the Plaintiff emailed Morey to complain that she was "smelling/feeling something other than the natural air freshener" in the chemical free restroom and she was temporarily using the mezzanine restroom. She stated that she could continue to do so unless she got a fibromyalgia flare-up. (Ex. H, ECF No. 23-9.) Morey responded on December 16, 2009, advising that he had spoken to all of the Tribune managers on December 15 and requested that they "make it clear" to their employees that the designated restroom was to be free of chemicals and perfumes, and that anyone using perfumes should go to a different restroom. He further stated that he was getting a frame for the sign so that it could be mounting on the door outside the restroom so that everyone could see it before entering the restroom. (*Id.*)

The Plaintiff did not immediately report any further problems with the restroom, but two months later, on February 12, 2010, she became ill after an employee from another department came into her department wearing perfume. The Plaintiff was permitted to go home.

The Plaintiff then met with Harris and the Vice President of Administration, Ed Henry, on February 22, 2010. The Plaintiff presented a note from Dr. Smith written on a prescription

pad indicating that the Plaintiff was "allergic to perfumes and some chemicals" and needed

washroom facilities that were "free of them and not used by people wearing perfume." (Ex. C,

ECF No. 23-4 at 14.) The Plaintiff requested that her entire department be made "perfume-free,"

that she be permitted to telecommute, and that she be given a private restroom with a lock and

key. According to the Plaintiff, at some point in the meeting, Henry said "something along the

lines of, 'Some people—if some people don't like how things are or don't like the decisions we

make, some people should choose to find employment elsewhere. . . . At some point there will

come a time we say that's all we can do. And you're gonna have to make some decisions.'" (Pl.

Dep. 61, ECF No. 37-2.) Harris requested that the Plaintiff have Dr. Smith send a formal letter.

The Plaintiff obtained a letter from Dr. Smith dated February 22, which stated that the Plaintiff

was "intolerant" of perfumes, hair sprays, and items from fragrances and was "sensitive to some

chemicals." (Ex. C, ECF No. 23-4 at 12.) Dr. Smith again wrote that the Plaintiff needed a

washroom facility and workplace that was "free of them and not used by people wearing

perfume" to prevent her asthma from flaring up.

In March 2010, the Defendant relocated the Plaintiff away from the rest of her

department to a different area of the building, which she shared with Karen Rallo, another

employee who suffered from allergies and asthma. Rallo posted a handwritten sign outside the

office stating it was an allergy free space, which the Defendant later replaced with a professional

sign. Shortly thereafter, the Plaintiff complained about an issue with the designated restroom and

the Defendant addressed her complaint with a communication to all employees about the

restroom being designated as chemical free.

In January 2011, ten months after being moved to the new office, the Plaintiff missed

work after being exposed to fragrances in the workplace. Harris inquired where the Plaintiff had been affected. The Plaintiff responded that people disregarded the signs on the doors to her office and the restroom, and entered wearing fragrances. She requested a restroom with a lock and key and that she obtain her own private workspace. The Defendant first attempted to handle the issues with further, specific instructions to employees about the restricted areas. In April 2011, the Defendant relocated the Plaintiff to a private office. On April 21, the Defendant informed the Plaintiff that the chemical free restroom would be locked and she would be given a key for it. On April 26, the Defendant told the Plaintiff that it was purchasing a High-Efficiency Particular Air (HEPA) Purifier for her.

On May 23, the Plaintiff filed a Charge of Discrimination with the EEOC, alleging that the Defendant violated the ADA, and that it retaliated against her for filing an Equal Pay Act suit in June 2010. One month later, on June 21, 2011, the Plaintiff's department was eliminated and she was laid off. On June 30, the Plaintiff filed a second Charge of Discrimination with the EEOC alleging that she was discharged in retaliation for her 2010 Equal Pay Act lawsuit and for her May 2011 EEOC filing. On December 27, 2011, the Plaintiff filed this lawsuit, alleging that the Defendant failed to reasonably accommodate her disability and laid her off because of her disability and in retaliation for her EEOC filing and her previous lawsuit.

## ANALYSIS

### A.    ADA Failure to Accommodate Claim

To prevail on a failure to accommodate claim, a plaintiff must show not only that (1) she is a "qualified individual with a disability," but also that (2) the defendant was aware of her

disability, and that (3) the defendant failed to reasonably accommodate the disability. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

Although the Defendant maintains that the Plaintiff did not suffer from asthma and has not established that she is disabled or that it regarded her as disabled, the Court's analysis will focus on the third element, whether the Defendant failed to reasonably accommodate a disability. The ADA's reasonable accommodation requirement applies only to "known" disabilities. 42 U.S.C. § 12112(b)(5)(A); *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) ("[T]he language of the ADA demonstrates that a reasonable accommodation is connected to what the employer knows about the employee's precise limitations."). Thus, "a plaintiff must normally request an accommodation before liability under the ADA attaches." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012) (internal quotation marks omitted). The term "reasonable accommodation," means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable [a qualified] individual with a disability … to perform the essential functions of that position[.]" 29 C.F.R. § 1630.2(o)(1)(ii). An employer chooses the reasonable accommodation, and is not required to provide the particular accommodation that an employee requests or prefers. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996). At the very least, the chosen accommodation must effectively accommodate the disabled employee's limitations. *Sears, Roebuck & Co.*, 417 F.3d at 802.

According to the Plaintiff, the Defendant violated her rights under the ADA when it did not grant her the accommodations she requested during the meeting with Harris and Henry on

February 22, 2010. Instead, it was not until April 2011 when she received her own office and a private, locked restroom. The Plaintiff alleges that this delay is evidence that the Defendant did not act reasonably to accommodate her disability. The Defendant counters that the Plaintiff engaged in activities that belied her assertions that she required her own restroom and created confusion regarding the precise contours of her restrictions. For example, she used other restrooms within the building that had not been designated as chemical free and where aerosol air fresheners had not been removed. The Defendant also claims that it readily responded to the Plaintiff's complaints whenever she had a concern about chemicals in the workplace and that it continued to engage in an interactive process to identify an appropriate accommodation.

Drawing on the Seventh Circuit's decision in *Cloe v. City of Indianapolis*, 712 F.3d 1171 (7th Cir. 2013), this Court concludes that no reasonable jury could find that the Defendant's efforts throughout the interactive process were unreasonable. In *Cloe*, the court considered the plaintiff's argument that the "winding path" and delays that her employer took to provide her with the effective accommodation of a permanent underground parking position showed that it did not act reasonably to accommodate her disability. 712 F.3d at 1178. The Court found no violation and offered the following explanation:

> Upon receiving an accommodation request, an employer is not required to provide the exact accommodation requested. *Sears*, 417 F.3d at 802. Instead, "the ADA obligates the employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Id.* at 805 (internal quotation marks omitted). This process brings the employee and employer together in cooperation to "identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000). "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." *Sears*, 417 F.3d at 805.

We do not think that the interactive process broke down here. After being informed of Cloe's needs, the City provided her with parking at a lot closer to the building. When that did not work out, it gave her a visitor's pass allowing her to park under the building and another pass allowing her to park on the nearby streets. And when that also did not work out, the City gave her a permanent underground parking spot once one opened up. This is exactly the sort of "interactive process," *id.* at 805, that the ADA calls for. In retrospect, of course, it clearly would have been easier to give Cloe a permanent underground pass at the outset. But that is only clear in retrospect. The City had no way of knowing that its other seemingly reasonable accommodations—a different lot, visitor parking, street parking—would be insufficient. And, more importantly, once the City found out that its proposed accommodations were insufficient, it acted with reasonable speed to come up with new ones. We do not think a reasonable jury could find these efforts unreasonable. As a result, summary judgment was proper on this claim.

712 F.3d at 1178–79.

The Plaintiff began working for the Defendant in 2005. She first mentioned a problem with the fragrances in her environment in July 2009, after she was inadvertently sprayed with an automatic room freshener. She reported to her supervisor that she was having an allergic reaction to the spray, and she was permitted to go home for the remainder of the work day. The Plaintiff's desk was moved near a window that she could open, and co-workers began using a natural cleanser, despite the Plaintiff not having provided the Defendant with any evidence that these changed were necessary to accommodate a known limitation. *See, e.g., Cloe*, 712 F.3d at 1178 (concluding that the accommodation process began when the plaintiff submitted a note from her doctor specifically requesting parking accommodations, not when she mentioned that she was having trouble walking); *Ekstrand*, 583 F.3d at 976–77 (finding that the plaintiff's own conclusory remarks that natural light was necessary to accommodate her seasonal affective disorder was not evidence of its medical necessity).

The accommodation process began, for purposes of the ADA, several months later on

September 24, 2009, when the Plaintiff produced a letter from Dr. Smith requesting a restroom accommodation. The Defendant responded by designating a chemical free restroom and notifying its employees not to use the restroom if they were wearing perfumes. A few days later, the aerosol air freshener in the chemical free restroom was removed. The Defendant did not report any issues with the accommodation until two months later, when she complained that someone was using a chemical spray in the chemical-free restroom. However, the Plaintiff also advised that she was not using the designated restroom, but had access to a different restroom. She stated that the alternative restroom would only be problematic if she had a fibromyalgia flare up. There is no evidence in the record that she had any such flare or that she had ever experienced one during her employment with the Defendant. When the Plaintiff made the same complaint a few weeks later—again with the caveat that another restroom was meeting her needs for the time being—the Defendant reminded all managers to make clear to employees that the designated restroom was to be free from perfumes and chemicals. The Defendant also put a sign on the door and, at the Plaintiff's request, allowed the door to remain open to air out. No reasonable jury could find that the interactive process had broken down at this point, and the Plaintiff does not allege that it did.

In February 2010, an employee from a different department came into the Plaintiff's department wearing a fragrance, and she was permitted to work from home for the remainder of her shift. Members of management then met with the Plaintiff to attempt to find a solution. The Plaintiff provided a letter from Dr. Smith dated February 22, which noted the Plaintiff's sensitivities to fragrances and chemicals, and stated that the Plaintiff needed a washroom facility and workplace that was "free of them and not used by people wearing perfume." In response, the

Defendant relocated the Plaintiff's office to the second floor and posted a sign indicating the workspace was an allergy-free space. She shared this space with another employee who suffered from allergies and asthma. When this accommodation did not work, the Plaintiff was given a private office, a restroom with a lock and key, and an air filter. The Plaintiff complains that the Defendant should have provided her with her own private office and restroom in February 2010 when she initially made the request, not in April 2011. However, an employer is not required to provide the particular accommodation that an employee requests or prefers. The Plaintiff does not identify any reason that the Defendant should have known that providing the designated allergy free office on the second floor along with another employee with allergies was inadequate to provide a workplace "free" from people wearing perfumes and fragrances. The doctor's note indicated that the Plaintiff should have a washroom and workplace free from perfumes, and the Defendant's response appears to be a reasonable attempt to provide such a space. The circumstances did not suggest that an immediate modification of the accommodation was necessary to permit the Plaintiff to perform the essential functions of her position.

The Plaintiff complains that she "continued to have problems with" the office space arrangement (Pl.'s Mem. 14), but she does not present evidence that shows she alerted the Defendant to the nature of her problems or their frequency. As far as the Court can discern, the Plaintiff complained in May 2010 about someone using perfume in the restroom, not her office, and the company addressed her concern with a company wide email.[1] There is no evidence that

---

[1] The Plaintiff maintains that her doctor sent the Defendant a note on March 31, 2010, asking that a survey be completed identifying all the chemicals being used in the building because the Plaintiff was still struggling with asthma due to chemicals and perfumes outside of her "safe" room. (Pl.'s Mem. 2, ECF No. 35.) The Plaintiff's designated evidence does not support her position that the Defendant received this correspondence. The Plaintiff cites to the deposition of Henry, but he testified he was not sure if there was a form, did not recall talking to Harris about it, and thus did not know if the survey had

the Plaintiff communicated to the Defendant any time between May 2010 and January 2011that the chosen accommodations were not working. When the Plaintiff called off work due to too many chemicals in January 2011, her employer inquired about the situation to try to identify the area that had caused her reaction. She then explained that employees had been entering her area to use office equipment or as a short cut to visit another employee, Ref Fransen. After receiving the Plaintiff's complaint, Harris issued a memo that employees were not to use the second floor area designated as a chemical free work space, and that employees wishing to see Ref Fransen should contact him to make other arrangements. In March, Harris reminded all employees about the chemical free restroom and asked employees who wore fragrances to use another restroom. In April, the Defendant moved the Plaintiff to a private office, and Harris advised all employees that the designated restroom would be locked and only accessible by key to those individuals who required a chemical free working environment.

The Plaintiff cites the language from *Sears*, that an "employer cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives," 417 F.3d at 806, and characterizes the Defendant's actions as ignoring her requests. The record shows that the Defendant neither ignored her requests nor obstructed the interactive process. To the contrary, it engaged her in discussion and attempted to provide accommodations that addressed her limitations. The Defendant then modified those accommodations when it received notice that other employees were not honoring the restrictions. Much like the employer in *Cloe*, who had no way of knowing that its otherwise seemingly reasonable accommodations would be insufficient because of circumstances outside

been completed. (Henry Dep. 45–47, ECF No. 35-3 at 6.)

its control, 712 F.3d at 1179, the Defendant had no way of knowing that some employees would not follow its clear directives regarding entrance into the restricted areas. Moreover, it was not immediately clear which chemicals or fragrances the Plaintiff could not tolerate, and "[r]easonableness does not depend solely on effectiveness or timeliness; in some circumstances, an accommodation can be reasonable even if it does not work as well as expected or if it takes a while to take effect." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir. 1996). "[R]easonableness does depend on a good-faith effort to assess the employee's needs and to respond to them." *Id.* Once the Defendant became aware that its accommodations were not sufficient, it acted with reasonable speed to implement new ones that would address the Plaintiff's needs. There was no breakdown in the interactive process, and no failure to provide a reasonable accommodation.

What became clear only in retrospect is not the standard to which the Defendant is held. The Plaintiff's evidence does not create triable issues of fact whether she was denied a reasonable accommodation in violation of the ADA.

**B.     Discrimination and Retaliation Claims**

The Plaintiff asserts a separate claim of discrimination under the ADA. She complains that her termination from employment on June 21, 2011, was the result of her disability and, more specifically, her requests for an accommodation. Additionally, the Plaintiff advances claims that her termination was in retaliation for filing an EEOC Charge and a lawsuit. A plaintiff may proceed under either the "direct" or "indirect" method of proof to establish these claims. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

*1.*     *Direct Method of Proof*

The Plaintiff first attempts to proceed under the direct method. Accordingly, she must present either direct or circumstantial evidence that her employer's actions were based on prohibited animus related to her disability. *See Dickerson*, 657 F.3d at 601. For the retaliation claims, she must show that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two. *Id.* Even when the Court views the fact most favorably to the Plaintiff, it cannot find triable issue of fact on the question whether her requests for accommodation, or her other protected activities, were a "substantial or motivating factor" for her termination. *Smith v. Bray*, 681 F.3d 888, 900 (7th Cir. 2012).

There is no direct evidence that discriminatory or retaliatory animus caused the Defendant to terminate the Plaintiff's employment. *See Bray*, 681 F.3d at 900 (direct evidence "would 'entail something akin to an admission'" of retaliatory motive) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011)); *see also Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003) (stating that evidence of retaliation is "direct" when, if believed, it would prove the fact in question without reliance on inference or presumption). By the Plaintiff's own admission, the Defendant advised her that her job was terminated because her department and its magazine ceased operations. Thus, the Plaintiff must present circumstantial evidence that would support an inference of discriminatory or retaliatory animus.

The Plaintiff's circumstantial evidence of causation for her discrimination claim is the fact that her requested accommodations were not immediately granted in February 2010, and the Defendant later questioned why the Plaintiff was using restrooms other than the designated chemical free restroom. These interactions with her employer provide no discernable connection

to the termination of her employment. In fact, the Plaintiff had already received a private office and a private, locked restroom by the time her employer eliminated her position. No reasonable jury could infer a causal link between the interactive process, which had been ongoing since 2009, and the Plaintiff's termination in June 2011 when her department within the organization was eliminated.

The Plaintiff's retaliation claim suffers from the same lack of evidence. Apart from mere speculation, she offers nothing to show that her position was eliminated *because of* her previous lawsuit, her EEOC Complaint, or her requests for accommodations. For example, she speculates that because her termination followed protected activity, her termination was the result of that activity. "'The mere fact that one event preceded another does nothing to prove that the first event caused the second. . . . [O]ther circumstances must also be present which reasonably suggest that the two events are somehow related to one another.'" *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)). *See also Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (noting that under ordinary circumstances, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is *other* evidence that supports the inference of a causal link") (internal quotation marks omitted, emphasis added); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[W]e remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."). This case does not involve the kind of circumstantial facts from which a jury could infer a causal link between the

protected activity and the elimination of the Plaintiff's job.

The Plaintiff first requested an accommodation for her medical condition in 2009. This was around the same time that she filed a charge of discrimination alleging a violation of the Equal Pay Act. She filed a lawsuit related to this charge in June 2010. Her employment was not terminated until June 2011, so there is no temporal proximity to these events. Although the termination was closer in time to her EEOC filing alleging an ADA violation, there is nothing the Plaintiff can point to that reasonably suggests that the Defendant's actions were motivated by anything other than business judgment. At the time the Defendant terminated the Plaintiff's employment, her department was continuing to lose money and the magazines the Plaintiff edited ceased publication altogether. Pozzi, the Plaintiff's supervisor, was the only employee in the Flagship Division who did not lose his job before the Plaintiff did—he was laid off a short time later. The Plaintiff complains that the Defendant should have transferred her to another department or advised her that she could apply for other positions, but does not designate any evidence in support of these assertions. Henry stated that for a reduction in force, all employees were encouraged to apply for other jobs that might be open. (Dep. of Ed Henry 61, ECF No. 37-1.) Regardless of whether the Plaintiff was encouraged to apply for another job, she has made no effort to identify whether another position was open when her magazines were shut down, whether she would have been qualified for the position, or if she would have actually applied for the position. Because she does not present evidence that would suggest she was entitled to another position, the fact that she was not transferred does not create an inference that retaliatory motive was at play.

The Plaintiff also thinks it suspicious that Harris commented during the Plaintiff's last

office move that it would only be temporary. This vague statement, even if it permits an inference that Harris knew that layoffs were imminent and that the Plaintiff would be losing her job, does not speak to the reason for the layoff and certainly does not reveal a retaliatory or discriminatory motive. When there is "no hint of disability discrimination in the content or context" of the statement, no rational jury could consider it to be evidence of discriminatory animus. *See Bunn v. Khoury Enters., Inc.*, — F.3d —, 2014 WL 2198557 at *6 (7th Cir. May 28, 2014) (noting the typical caution about relying on stray remarks as evidence of discriminatory animus "where the content *is* arguably discriminatory" and finding even more reason to be cautious where the remarks "do not single out the plaintiff based on his disability or any other individually distinguishable characteristic").

It would strain the limits of inference to find that the Plaintiff has presented sufficient evidence under the direct method of proof to present her retaliation and discrimination claims to a jury. The Plaintiff's designated evidence does not show that her protected activity was a motivating factor in the Defendant's decision to terminate her employment.

### 2.     *Indirect Method of Proof*

The Plaintiff also attempts to prove her claims through the indirect method of proof. Under this method of proof, a plaintiff must first establish a prima facie case of discrimination by showing that (1) she is disabled under the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Dickerson*, 657 F.3d at 601. The indirect, burden-shifting method for a retaliation claim is similar. A plaintiff must establish

that she (1) engaged in protected activity; (2) was performing her job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *Id.* Once a plaintiff satisfies this initial burden, the defendant has the burden to present a non-invidious reason for the adverse employment action. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant's proffered reason was pretextual. *Id.*

In support of her prima facie case, the Plaintiff argues that two similarly situated non-disabled individuals in her department, Tim Stonecipher and Joe Hektor, were offered positions in other departments and were not laid off when the Flagship Division was eliminated. When a plaintiff is relying on the evidentiary boost that a prima facie case provides to infer that discriminatory animus prompted the employment decision, the similarly situated employee she compares herself to must be "directly comparable to the plaintiff in all material respects." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quotation marks omitted); *see also Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (the question is whether "members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment"). Here, the Plaintiff identifies no material similarities between herself and Stonechiper and Hektor, but the Defendant's designated evidence reveals several, important differences.

The Plaintiff was a part-time editorial coordinator. Stonecipher was a full-time graphic designer in the Flagship Division and transferred to a position of graphic artist in the News and Editorial Department on July 12, 2010, eleven months before the Flagship Division was eliminated. Hektor was employed full-time by the Tribune as an Advertising Production

Designer in the Advertising Department, not the Flagship Division. He transferred to the Ad Services Department in June 2010, a full year before the Flagship Division was eliminated. Hektor changed positions again in February 2011 when he became a Graphic Designer/Team Leader on the night shift. The Plaintiff's argument regarding these individuals appears to be that they were offered other positions before the elimination of the Flagship Division so they would not be laid off. This is beside the point. Even if true, the differing treatment would not create a prima facie case of discrimination unless Stonecipher and Hektor were appropriate comparators. But the Plaintiff makes no attempt to explain how the identified individuals, full-time employees with different jobs, were similarly situated to her. The Plaintiff's argument—or more precisely her lack of argument—suggests that she believes that by simply identifying any employee who avoided being laid off with the elimination of the Flagship Division, she has created an inference of impermissible motive. Even using a flexible approach to the similarly situated requirement, this showing does not provide "enough common factors . . . to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406 (7th Cir. 2007)). "[C]omparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories." *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009); *see also Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 742 (7th Cir. 2011) (noting that "[t]he purpose of the 'similarly situated' comparator element is to ensure that all other variables are discounted so that an inference of unlawful intent would be reasonable" and that "comparators must be similar enough that any differences in their treatment cannot be attributed to other variables").

Even if the Court looked past the prima facie requirements, the Plaintiff would still have to present evidence that the Defendant's stated reason for terminating her employment was a pretext for illegal action. The Defendant's designated evidence shows that publications in the Flagship Department cost more to produce than its advertising revenues could support. Despite efforts to reduce expenses, the gap between revenues and expenses continued to get larger. The entire Department was eliminated, and the magazines the Plaintiff worked on as editorial coordinator were no longer produced or published.

"Pretext means a dishonest explanation, a lie rather than an oddity or an error. Pretext is more than a mistake on the part of the employer; it is a phony excuse. Showing pretext requires proof that the defendant's explanation is unworthy of credence." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (citations, brackets, and quotation marks omitted); *see also Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) (stating that even if an employer's reason for terminating an employee is "mistaken, ill considered or foolish," pretext has not been shown as long as the employer "honestly believed those reasons"). The Defendant eliminated the magazines that the Plaintiff edited and, in doing so, eliminated the Plaintiff's job and terminated her employment. It is not the Court's role "to question the wisdom of a company's decisions on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946–47 (7th Cir. 2006). On the issue of pretext, the Plaintiff produces no evidence and no analysis. Thus, nothing in the record suggests that the Defendant's articulated reason for eliminating a failing division and laying off its employees was a cover for illegal discrimination or retaliation.

The Plaintiff has not presented circumstances from which intentional discrimination or

retaliation can be inferred under the indirect, burden shifting method of proof.

**C.     Hostile Work Environment**

The Plaintiff's two-count Complaint does not contain any claim that she was subjected to a hostile work environment. Hostile work environment claims are different from disparate treatment claims because the issue is not whether particular acts constitute employment discrimination or retaliation, but whether the overall environment in which a plaintiff worked was illegally hostile. *Cf. Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003) ("Normally, retaliation, sex discrimination, and sexual harassment charges are not 'like or reasonably related' to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another."). Here, it is not clear whether the Plaintiff's EEOC Complaint describes the conduct giving rise to her claim that she suffered a hostile work environment, because the Complaint has not been included in the record before the Court. Thus, the Court cannot say that the Complaint served its dual purpose of giving the Defendant notice of the factual basis for the claims now asserted in this litigation and affording the EEOC an opportunity to investigate the claims. *See Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 502 (7th Cir. 1994). Moreover, a claim raised for the first time in response to a motion for summary judgment is not properly before the Court. *Conner v. Ill. Dep't of Nat'l Res.*, 413 F.3d 675, 679 (7th Cir. 2005).

Even if the Court looks past these problems, the Plaintiff's claim would fail on its merits. The Seventh Circuit has not yet decided whether a claim for hostile work environment is cognizable under the ADA. *See Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005) (citing *Conley v. Village of Beford Park*, 215 F.3d 703, 712–13 (7th Cir. 2000). The court has assumed,

however, that the standards for proving such a claim would mirror the standards already established for Title VII hostile work environment claims. *Id.* That means, to succeed on her claim, the Plaintiff must have experienced harassment "sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment" *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (citing *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005)). "The environment must be both subjectively and objectively offensive." *Id.* (citing *Rogers*, 320 F.3d at 752). "An objectively hostile environment is one that a reasonable person would find hostile or abusive." *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In evaluating whether a workplace is hostile, a court must look at the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23.

The Plaintiff presents a litany of complaints that she says show that her "disability was not respected or appreciated by at least some of her fellow employees, including Ed Henry, a vice president, who on several occasions came into her office wearing cologne." (Pl.'s Mem. 24, ECF No. 35). She cites a date in September 2010 when Henry used her office as a shortcut to visit another employee, and at least two other times when she believes this happened. The Plaintiff maintains that on numerous occasions for the first few months after she was moved to the chemical free office, employees from another department would enter the office to speak to another employee, whose office was inside her area. On several of these occasions, she had to leave the office for an extended period of time. Employees would use the copier in her area until

she placed a sign on it asking them to use a different copier. A younger employee retrieved items from a printer in the area on numerous occasions, outside venders used the area as a shortcut, and employees used the freight elevator by the secondary door and sometimes congregated to talk. The Plaintiff does not indicate that these individuals were wearing fragrances or that their actions caused her problems. She states that other people wearing fragrances would meet outside the ladies' restroom and the vending areas near her office door. She maintains that these "situations often made me ill, and caused the need to . . . complain repeatedly about things over a period of about 19 months." (*Id.* (citing Interrogatory Responses).)

In the instances cited above, there is no suggestion that the Plaintiff's coworkers acted out of an animus for her disability. This is problematic because, in a hostile work environment claim, the motive for the alleged mistreatment must be sufficiently connected to the protected category, such as sex or race. *See, e.g.*, *Hall v. City of Chi.*, 713 F.3d 325, 332 (7th Cir. 2013) (stating that the plaintiff had to show not only hostile work environment but that the motive for the mistreatment was her gender); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (finding that incidents did not "have the required racial character and purpose to support a racial harassment claim"). For every incident the Plaintiff cited, employees or vendors had legitimate work reasons to enter the area or were simply congregating with others outside the area where she worked. There is nothing to suggest that these people gave *any thought* to the Plaintiff's medical issues when they engaged in these benign activities. Viewing the entire context of the workplace, no reasonable jury could find the environment objectively offensive or abusive.

In addition to the above conduct, the Plaintiff alleges behavior that could potentially be construed as displaying an animus based on her disability. She claims that, three times, a scented

product was "poured" on the hallway carpet outside her door, and that the scent made her ill. The Plaintiff appears to assume that the person who did this was targeting her. However, she does not explicitly make this claim, and the product could have just as readily been unintentionally left by the outside cleaning crew or others due to carelessness. Thus, the Court is left with only speculation regarding the motive behind the scented product on the carpet, which is meaningless because "[i]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (quoting *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841–42 (7th Cir. 1996)). Even if the Court assumes bias directed at the Plaintiff because of her disability, when this conduct is viewed in the context of the factors the Seventh Circuit has deemed crucial, it is not sufficiently severe or pervasive to support a claim for a hostile work environment. The scented product was used outside the Plaintiff's office three times over an extended period of employment. There was no physical threat or humiliation; the Plaintiff does not even know who left the product. The Plaintiff claims that the product made her ill, but she does not indicate that she was unable to perform her job because of it. *See, e.g.*, *Mannie*, 394 F.3d at 983 (plaintiff "submitted no evidence that could establish that she experienced a tangible employment action or that she was unable to perform her job because of the conduct of her supervisors and co-workers"). Additionally, the Plaintiff has made no attempt to prove that the Defendant was "'negligent either in discovering or remedying the harassment,'" as is necessary to hold an employer liable for a hostile work environment perpetrated by coworkers. *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011) (quoting *Williams v. Waste Mgmt. of Ill.*, 361 F.3d

1021, 1029 (7th Cir. 2004)). The record is devoid of any evidence that the Plaintiff reported the incidents of scented product on the carpet to anyone.

The Plaintiff has not put forth facts upon which a reasonable jury could find the Defendant liable to the Plaintiff because she was subjected to a hostile work environment on the basis of her disability.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendant's Motion for Summary Judgment [ECF No. 20]. Judgment will be entered in favor of the Defendant and against the Plaintiff.

SO ORDERED on July 1, 2014.

  s/ Theresa L. Springmann     
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION